# IN THE SUPREME COURT OF TEXAS

════════════

No. 15-0217

════════════

DEBRA LAVERIE, PH.D., PETITIONER,

v.

JAMES WETHERBE, PH.D., RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued September 14, 2016**

JUSTICE BROWN delivered the opinion of the Court.

A Texas Tech professor and associate dean, James Wetherbe, sued a colleague, Debra Laverie, for defamation after he was passed over for promotion. Laverie moved for summary judgment, arguing Wetherbe must name Texas Tech as a defendant and dismiss her from the suit. The trial court denied that motion and the court of appeals affirmed on the ground that Laverie failed to offer evidence she was not furthering her own purposes, rather than her employer's, when she made the allegedly defamatory statements. We disagree. Laverie was entitled to dismissal when she furnished conclusive evidence she was acting within the scope of her employment; she need not have offered evidence of her motives for making the allegedly defamatory statements. Accordingly, we reverse the court of appeals and render judgment dismissing Laverie from Wetherbe's suit.

# I

In the fall of 2011 a search was underway to select a new dean of the Rawls College of Business Administration at Texas Tech University. Texas Tech's provost, Bob Smith, formed a search committee to which he appointed both Wetherbe and Laverie, the business school's senior associate dean. Wetherbe later withdrew from the committee to seek the deanship himself.

Smith testified that, as senior associate dean, Laverie oversaw faculty recruiting and hiring; she was effectively running the business school because the outgoing dean was ill. Accordingly, Smith said he "relied on [her] to provide updates from the college and first-hand insights into the ongoing search." Sometime after Wetherbe withdrew from the search committee, Smith asked Laverie about the faculty's perspective on the search process. Laverie reported that "it was her sense that the faculty considered Wetherbe to be a 'singular' candidate." Smith said he interpreted Laverie's report to mean that "some faculty thought Wetherbe had the search 'wired,' or that by entering the race he was the presumptive front-runner."

Smith then contacted Bob Lawless, a former Texas Tech president who was managing the search for the university, to confirm that all prospective candidates understood the search was fair and open to all. According to Smith, Lawless told him an external candidate had expressed concerns over rumors of a strong, internal candidate. This prompted Smith to send an e-mail to the entire college faculty and the search committee "assuring them that the search was indeed open and that there was no strong favorite for the position."

Sometime during the search, Laverie separately informed Smith that a staff member reported that Wetherbe was using "some kind of listening device or other to eavesdrop on people's

conversations in the Rawls College." Smith said he considered it "only a hearsay report" and denied it played any role in his decision to send the e-mail regarding the search or his ultimate decision on Wetherbe's candidacy.

The search concluded in spring 2012. Nine candidates, including Wetherbe, were interviewed off campus. The committee then selected Wetherbe as one of four finalists for on-campus interviews. Smith, however, declined to further interview Wetherbe because he was "unimpressed with his performance in the first interview" and "strenuously disagreed with his leadership philosophy and was discouraged by his lack of vision" for the business school.

During the search, Wetherbe was also nominated to be a Horn Professor, a mark of distinction at Texas Tech. Although the Horn Professor selection committee had recommended approval of his nomination, Smith withdrew his support after discovering Wetherbe was not tenured, which he believed was a prerequisite for a Horn professorship. After informing the committee that Wetherbe was not tenured, Smith testified that "approximately 19 out of 20 that responded confirmed their agreement that Wetherbe could not be a Horn Professor without being a tenured faculty member."

Having been passed over for both the dean opening and a Horn professorship, Wetherbe sued for defamation. He claims Laverie's statements to Smith about his perceived front-runner status and his supposed use of a "listening device" torpedoed his chances for promotion. Wetherbe theorizes that Laverie fabricated the stories to sabotage him; Smith, however, maintains that while he relied on Laverie "to provide information and counsel about the business school," she "did not cause, nor otherwise motivate, me to make any of the decisions I made in regard to [Wetherbe]."

3

Laverie filed a traditional motion for summary judgment arguing the Tort Claims Act required Wetherbe to name Texas Tech as a defendant and dismiss her from the lawsuit. Wetherbe argued in response that Laverie was not entitled to dismissal because she did not act in the scope of her employment when she defamed him. The trial court denied Laverie's motion and she appealed. The court of appeals affirmed, concluding that although Wetherbe "acknowledges that speaking with the University's provost about occurrences at the Rawls College may fall within Laverie's duties for the University," the record nonetheless did not "conclusively establish that, on the occasion of their conversation regarding Wetherbe, she was serving any purpose of her employer, as opposed to furthering her own purposes only." No. 07-13-00348-CV, 2015 WL 739670, at *4 (Tex. App.—Amarillo Feb. 20, 2015) (mem. op.). Specifically, the court of appeals noted the record "contains no direct evidence of Laverie's intentions when she spoke with Smith about Wetherbe before Smith sent his email, and does not conclusively establish the nature of her motivation in doing so, either as to the dean search or as to the report of Wetherbe's use of a listening device." *Id.* We granted review.

## II

### A

We review de novo a trial court's denial of a traditional motion for summary judgment. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). The Tort Claims Act provides a limited waiver of governmental immunity, *see* TEX. CIV. PRAC. & REM. CODE § 101.023, and contains an election-of-remedies provision intended to "force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope

of his or her employment such that the governmental unit is vicariously liable." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008) (interpreting TEX. CIV. PRAC. & REM. CODE § 101.106). Laverie argues she should be dismissed from Wetherbe's suit because the election-of-remedies provision compels "the expedient dismissal of governmental employees when suit should have been brought against the government." *See Tex. Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 355 (Tex. 2013). "The Legislature mandates this determination in order to 'reduc[e] the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery.'" *Alexander v. Walker*, 435 S.W.3d 789, 790 (Tex. 2014) (per curiam) (quoting *Garcia*, 253 S.W.3d at 653). The election-of-remedies provision provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE § 101.106(f).

More succinctly, a defendant is entitled to dismissal upon proof that the plaintiff's suit is (1) based on conduct within the scope of the defendant's employment with a governmental unit and (2) could have been brought against the governmental unit under the Tort Claims Act. *See Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011); *Anderson v. Bessman*, 365 S.W.3d 119, 124 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Scope of employment" is further defined as "the performance for a governmental unit of the duties of an employee's office or employment and

5

includes being in or about the performance of a task lawfully assigned to an employee by competent authority." TEX. CIV. PRAC. & REM. CODE § 101.001(5).

**B**

Wetherbe does not dispute Laverie is a government employee or that Wetherbe's defamation claim could have been brought against Texas Tech under the Tort Claims Act. The only issue is whether Laverie acted within the scope of her employment when she made the allegedly defamatory statements. Wetherbe seems to concede Laverie possibly acted within the scope of her employment—he simply argues we cannot know with certainty unless we know *why* she said what she said. He therefore agrees with the court of appeals that the dismissal standard requires Laverie to furnish conclusive evidence she was "serving any purpose of her employer, as opposed to furthering her own purposes only." 2015 WL 739670, at *4.

Nothing in the election-of-remedies provision or the statutory definition of "scope of employment" suggests subjective intent is a necessary component of the scope-of-employment analysis. Rather, the Tort Claims Act focuses on "performance . . . of the duties of an employee's office or employment," which calls for an objective assessment of whether the employee was doing her job when she committed an alleged tort, not her state of mind when she was doing it. TEX. CIV. PRAC. & REM. CODE § 101.001(5). Moreover, Wetherbe's view departs from our traditional scope-of-employment analysis in *respondeat superior* cases, which concerns only whether the employee is "discharging the duties generally assigned to her." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994); *see also Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) ("The employee's acts must be of the same general nature as the conduct authorized or

6

incidental to the conduct authorized to be within the scope of employment."). We presume the Legislature knew of our longstanding approach to the scope-of-employment analysis and see nothing in the Tort Claims Act compelling a different approach. *See Dugger v. Arredondo*, 408 S.W.3d 825, 835 (Tex. 2013) ("[W]e presume the Legislature enacts a statute with knowledge of existing law.").

The scope-of-employment analysis, therefore, remains fundamentally objective: Is there a connection between the employee's job duties and the alleged tortious conduct? The answer may be yes even if the employee performs negligently or is motivated by ulterior motives or personal animus so long as the conduct itself was pursuant to her job responsibilities. *See, e.g.*, *Galveston, H. & S. A. Ry. Co. v. Currie*, 96 S.W. 1073, 1074 (Tex. 1906) ("It is now settled, in this state at least, that the presence of such a motive or purpose in the servant's mind does not affect the master's liability, where that which the servant does is in the line of his duty, and in the prosecution of the master's work."). We find no case law from our courts of appeals supporting the position Wetherbe and the court of appeals advance in this case. *Cf. Melton v. Farrow*, No. 03-13-00542-CV, 2015 WL 681491, at *3 (Tex. App.—Austin Feb. 10, 2015, pet. denied) ("Texas appellate courts have consistently held that acts may still be within the scope of the employee's duties even if the specific conduct that forms the basis of the suit was wrongly or negligently performed or driven by personal animus."); *Anderson*, 365 S.W.3d at 125–26 ("So long as it falls within the duties assigned, an employee's conduct is within the scope of employment, even if done in part to serve the purposes of the employee or a third person.") (internal quotation marks omitted). Given the uniformity of our case law and the lack of any mention of subjective intent in the election-of-remedies provision, we see no reason for such a drastic departure from our longstanding approach to *respondeat superior* cases.

7

**C**

The court of appeals held otherwise, relying largely on our reference to the Restatement (Third) of Agency in *Alexander v. Walker*. *See* 2015 WL 739670, at *3. There, we acknowledged the Restatement's assessment that "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct *not intended by the employee* to serve any purpose of the employer." 435 S.W.3d at 792 (quoting RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (2006)) (emphasis added). From this, the court of appeals concluded Laverie was required to conclusively establish "she was serving any purpose of her employer, as opposed to furthering her own purposes only." 2015 WL 739670, at *4.

*Alexander* itself disproves any suggestion we endorsed this view. Despite our citation of section 7.07(2), we never demanded evidence of the defendants' subjective intent in holding they were entitled to dismissal. *See Alexander*, 435 S.W.3d at 792. Nor do we perceive any inconsistency between the Restatement's articulation of the scope-of-employment analysis and our established case law. Section 7.07(2) begins by stating that "[a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (2006). It then posits a negative definition of scope of employment: an act "is *not* within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." *Id.* We believe the Restatement's references to intent and purpose simply reflect that an employee whose conduct is unrelated to his job, and therefore objectively outside the scope of his employment, is engaging in that conduct for his own reasons. And in cases in which the employee

8

assumes an independent course of conduct, it is no surprise that courts might mention his reasons for doing so. *See, e.g.*, *Tex. & P. Ry. Co. v. Hagenloh*, 247 S.W.2d 236, 241 (Tex. 1952) ("[T]he evidence conclusively showed that the employee in making the assault was actuated by personal animosity and that there was no close relation between the assault and the performance of the duties of the employment."). This is not tantamount to a threshold requirement that government-employee defendants conclusively prove their subjective intent to establish they acted in the scope of their employment. Nor does the second sentence of section 7.07(2), by clarifying what is not within the scope of employment, impose on government employees the burden to conclusively satisfy a negative definition.

Wetherbe further argues our holding in *Minyard Food Stores, Inc. v. Goodman* turned on an evaluation of the employee's subjective intent. *See* 80 S.W.3d 573 (Tex. 2002). *Minyard* involved allegedly defamatory statements a grocery-store manager made against a co-worker during an investigation of an alleged workplace affair. *Id.* at 574–75. Specifically, the plaintiff, a Minyard employee, alleged that a store manager defamed her when he falsely claimed to have kissed and hugged her. *Id.* at 575. We noted that although his employer compelled his participation in the investigation, defamatory statements made in the course of the investigation could not "further [the employer's] business and accomplish a purpose of [the manager's] job." *Id.* at 579. We distinguished the facts in *Minyard* from cases in which other courts concluded allegedly defamatory statements were within the scope of employment by articulating "a critical distinction between defaming someone to one's employer and defaming someone for one's employer." *Id.* (citing examples). From this, Wetherbe gleans an evaluation of the manager's subjective intent. Yet we held the manager's

9

statements fell outside the scope of employment because they did not "further [the store's] business and accomplish a purpose of [the manager's] job." *Id.* In other words, the manager's admissions to "kissing and hugging" a co-worker were not in furtherance of his responsibilities in running a grocery store. The "critical distinction" we acknowledged did not invite a subjective-intent assessment, but rather clarified the grounds under which defamation might be fairly considered to be in the objective scope of employment.

**D**

Aside from lacking support in our case law, Wetherbe's approach presents a number of issues rendering it inconsistent with the election-of-remedies provision. "In waiving governmental immunity, the Legislature correspondingly sought to discourage or prevent recovery against an employee." *See Franka*, 332 S.W.3d at 384. In that vein, the election-of-remedies provision "favors the expedient dismissal of governmental employees when suit should have been brought against the government," *Ngakoue*, 408 S.W.3d at 355, and "reduc[es] the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery." *Garcia*, 253 S.W.3d at 657. Yet requiring proof of an employee's subjective intent would burden government employees with proving a negative to attain dismissal; that is, that they acted without ulterior motives or animus. *See State Farm Mut. Auto. Ins. Co. v. Matlock*, 462 S.W.2d 277, 278 (Tex. 1970) (discussing the "difficulty in proving a negative"). Moreover, requiring proof of subjective intent invites partial litigation of the underlying defamation claim itself, as questions of whether the statement was true or false, and whether Laverie knew it was truth or false, will inevitably spring forth when considering *why* she said it. The function of the election-of-remedies

10

provision, however, is not to adjudicate the underlying tort claim but to quickly dismiss government employees when the suit should be brought against their employer. *See Ngakoue*, 408 S.W.3d at 355.

Finally, requiring government employees to produce conclusive evidence of their subjective intent mandates evidence that is often irrelevant to the ultimate question of whether the alleged tort was committed within the scope of employment. Laverie's personal motivations, if she had any, ultimately do not change her job responsibilities and whether the statement was in performance of them. *See Melton*, 2015 WL 681491, at *3; *Anderson*, 365 S.W.3d at 125–26. An employee will of course sometimes have personal motives for performing her job a particular way, and a statement made or an act done may simultaneously fulfill a job responsibility while furthering an ulterior motive. The line between the professional and personal is sometimes difficult to discern, as people typically do not carefully or consciously delineate between the two. The fundamental inquiry therefore is not whether Laverie did her job well or poorly, or whether she did her job selfishly or altruistically, but simply whether she was doing her job.

### III

Wetherbe apparently does not argue Laverie acted outside the scope of her employment barring consideration of the subjective intent behind her allegedly defamatory statements. Laverie was senior associate dean of the business school and a member of the dean search committee. According to Texas Tech's provost, Laverie was "essentially running that college" while the outgoing dean battled illness. Smith testified: "[W]hen I need to know something about the college, we call Debra Laverie," and that "if we have a question about issues related to hiring of new faculty or finances, what have you, we typically go through [Laverie]." Smith did so when he asked Laverie

11

about the faculty's perspective on the leading candidates for the open dean position, which Laverie was in a position to provide both as senior associate dean and a search-committee member. Notably, Laverie did not volunteer that the faculty perceived Wetherbe to have the inside track. Rather, she offered that information in direct response to an unsolicited question by the provost. Smith further testified it was within Laverie's role to "bring personnel complaints" to his attention, which she did when she informed him about the "listening device" report. Even if Laverie defamed Wetherbe, she did so while fulfilling her job duties.

* * *

The court of appeals erred in denying Laverie dismissal from Wetherbe's lawsuit on the ground that the record did not "conclusively establish that, on the occasion of their conversation regarding Wetherbe, she was serving any purpose of her employer, as opposed to furthering her own purposes." 2015 WL 739670, at *4. Government employees are not required to prove their subjective intent behind an allegedly tortious act in order to be dismissed from a suit pursuant to the Tort Claims Act's election-of-remedies provision. We conclude Laverie was acting in the scope of her employment as senior associate dean and a member of the dean search committee when she made the allegedly defamatory statements of which Wetherbe complains. Accordingly, we reverse the court of appeals and render judgment dismissing Laverie from the underlying suit.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED: December 9, 2016

12